FILED

UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

10 JAN 12 AM II: 06

CLERK - LAS CRUCES

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

JUANITA L. ESTRADA as the
Personal Representative of Michael Molina, deceased;
JUANITA L. ESTRADA individually; and
REFUGIA LOPEZ, individually,

        Plaintiffs,

vs.                                             No. CIV 09-10 RB/CG

THE CITY OF LAS CRUCES;
LCPD POLICE OFFICER MARK DOMINGUEZ;
LCPD POLICE OFFICER HORACIO RIVERA;
GEORGINA P. CORDOVA as the Personal Representative of the
Estate of LCPD Police Officer David Cordova; and
LCPD SUPERVISORY POLICE OFFICER(S)
JOHN DOE(S) of the Las Cruces Police Department,

        Defendants.

### MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on Defendants' Motion for Summary Judgment as to

the Claims of the Estate of Michael Molina (Doc. 52), filed October 6, 2009. For the reasons set

forth below, Defendants' Motion for Summary Judgment is **GRANTED IN PART and DENIED**

**IN PART**.

## I.    PROCEDURAL BACKGROUND

This case involves the police shooting of Michael Molina, now deceased. Plaintiff Juanita

Estrada brings state and federal claims as the personal representative of the estate of Michael Molina

against Officers Mark Dominguez, Horacio Rivera, and David Cordova, their supervising officers,

and the City of Las Cruces. Juanita Estrada is Mr. Molina's mother. A Complaint for Damages in

this matter was originally filed with the District Court of Doña Ana County on December 15, 2008.

Notice of Removal was filed on January 6, 2009, and the case was properly removed to federal court under 28 U.S.C. § 1441. An Amended Complaint for Damages was then filed on May 9, 2009. This Court has jurisdiction to hear the case under 28 U.S.C. § 1331, as this case involves federal questions arising under 42 U.S.C. § 1983. The Court has jurisdiction to hear Plaintiff's state law claims under 28 U.S.C. § 1367, as the claims arise out of the same case or controversy. *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 349 (1988) (finding that the claims must arise out of the "same nucleus of operative facts"). Defendants filed their Motion for Summary Judgment as to the Claims of the Estate of Michael Molina, which is now before the Court, on October 6, 2009. Plaintiff filed her Response to the Motion on October 21, 2009, and Defendants filed a Reply on November 3, 2009.

## II.    STATEMENT OF FACTS

The trial court must view the evidence and draw any reasonable inferences therefrom in favor of the non-moving party. *Fuerschbach v. Southwest Airlines Co.*, 439 F.3d 1197, 1207 (10th Cir. 2006). Consequently, the facts in a memorandum opinion and order are typically set forth in the light most favorable to the non-moving party, in this case, Plaintiff Juanita Estrada. The facts set forth below have been gleaned from the parties' pleadings and discovery materials provided to the Court. In viewing the facts, the Court has made all reasonable inferences in favor of Plaintiff; however, the Court has noted where there exist disputed facts and whether they are material.

Early in the afternoon on December 26, 2006, Juanita and Gilbert Estrada were entertaining Juanita's sisters Refugia Lopez and Hilaria Ludwig, and Hilaria's husband William Ludwig at their residence on Starview Drive in Las Cruces, New Mexico. While the three sisters—Juanita, Refugia, and Hilaria—were making coffee in the kitchen, Juanita's son Michael arrived at the front door and rang the bell. Michael had been living with Juanita and Gilbert, and they had also given Michael a

truck to drive that belonged to Gilbert. Juanita, however, had become concerned about her son's behavior. About three to four months prior, Michael had driven the truck home drunk, and then again just a few days before Christmas. In addition to the drunk driving, Michael had recently abandoned the truck on the side of the highway, and when Mrs. Estrada gave him a ride to retrieve it, they discovered that it had been towed. As a result, Gilbert Estrada had to retrieve the truck from the police impound. Michael had also purchased a necklace from Zales for his girlfriend Bernice with Juanita Estrada's credit card and failed to make one of the payments. According to Mrs. Estrada, Michael had been drinking more than he should and acting irresponsible. Her ex-husband was an alcoholic, and she wanted Michael to stop drinking and attend AA meetings. Michael's behavior led the couple to decide that Michael could not use the truck anymore and that he was no longer welcome to live with them. Mrs. Estrada had decided it was time to put her foot down, and on December 26, 2006, they changed the locks on the house and decided that they would tell Michael he needed to move out.

When Michael rang the doorbell that afternoon, Mrs. Estrada went to the front door to see who it was. When she saw it was Michael, she told him to go away. Michael wanted to take the truck, and he pleaded with his mother not to turn him away. When his mother would not let him in the front door, Michael went around to the back of the house, jumped the fence, and came into the kitchen through the back door. Juanita and her son then began to talk. Mrs. Estrada told him that they were taking the truck away from him because it was irresponsible to drink and drive and he could kill someone. Furthermore, the truck was registered in Gilbert Estrada's name, and they were concerned that Gilbert could be held liable if something happened.

Mrs. Estrada also brought up the issue of the missed credit card payment for the necklace that

3

Michael had bought for Bernice. Michael was upset and called Bernice so that she could tell his mother that he had made the payment. Michael went out to the backyard to talk to Bernice on the cordless phone. From the kitchen, Juanita could hear Michael yelling at Bernice. When he was done talking to Bernice, Michael dropped the phone outside, came back into the kitchen, and started up again about how he wanted to take the truck.

Michael was clearly distraught, and Juanita Estrada was becoming concerned. Michael then started talking about Mrs. Estrada's other son Isaac, and how she did more for Isaac than for him. At this point, Michael told his mother that she had abandoned him, picked up a knife from the kitchen, and said that he should kill himself. Juanita then told her sister Hilaria to have someone call the police, but continued to talk to Michael. Hilaria's husband William Ludwig went outside and called 911 from his cell phone. While they were waiting for the police, it appears that Michael started to calm down. According to Juanita, he was still yelling on and off, but for the most part, he was just sitting in the kitchen with the knife and crying.

Although the above facts are not in dispute, several of the facts leading up to Michael Molina's death are disputed by the parties. First, the parties dispute what information central dispatch conveyed to the officers before they arrived at the Estrada residence. Mr. Ludwig made three calls to 911, requesting that they send police to the house. After the second call, Mr. Ludwig went across the street to wait for the police, where he made a third call, informing the dispatcher that Michael had a knife and was threatening to kill himself. However, this information may not have been conveyed to the officers. The officers' statements generally indicate that the call was updated from a disorderly to a domestic while they were en route, but they do not mention anything about Michael being suicidal, and they do not state that they were informed that the suspect had a knife.

When the officers arrived, they were greeted by Mr. Ludwig, who informed them that Michael was still inside the house and that he had a kitchen knife. At some point after their arrival, Mr. Molina came out the front door and stood on the porch with a kitchen knife in his hand. The knife was approximately one foot in length, with a seven inch blade and a five inch handle. The parties dispute whether the officers began to advance across the yard before or after Michael exited the house. Plaintiff Juanita Estrada contends that the officers were still standing on the sidewalk talking to Mr. Ludwig when the slamming of the home's screened security door alerted the officers to Michael's presence, causing them to draw their weapons and advance across the yard toward the front porch. Defendants, however, contend that they had already began to advance across the yard when Michael leaned out the front door and yelled, "Get the fuck out of here!" The incident details report from central dispatch indicates that from the time the officers arrived until Michael was shot, no more than one minute and fourteen seconds elapsed. Exactly when the officers began to advance on Michael, how much time they gave him to comply with their instructions to drop the knife, and what, if anything, Michael said to the officers are clearly important factual issues in this case because they indicate whether or not Michael was acting as an aggressor.

When Michael exited the house, he stood on the front porch with the knife in his hand, and the three officers yelled at him to drop the knife. Plaintiff Juanita Estrada contends that Michael had both hands raised above his head in a show of surrender, while Defendants contend that Michael held the knife in one raised hand and yelled, "I'm not dropping shit!" Mr. Ludwig, who was standing on the sidewalk behind the officers, stated in his deposition that Michael was standing on the porch with both arms raised and the knife pointed straight up in the air in a show of surrender. While Mr. Ludwig also stated that Michael was talking to the police, he could not hear what he said due to the

5

officers' yelling. Again, these factual disputes are material because they help determine whether Michael was attempting to surrender or behaving aggressively towards the officers.

From the time he exited the house until the time he was shot, Michael did not leave the front porch of the house, which was located approximately forty-six feet from the sidewalk where the officers were standing when they arrived. Furthermore, according to Plaintiff Juanita Estrada, the officers did not begin to advance across the yard toward Michael until 4:12.17 p.m., which is when Officer Rivera radioed in a 10-3 to clear the channel and dropped his radio on the gravel near the sidewalk. Approximately four seconds later at 4:12.21 p.m., Officer Rivera radioed in a 10-18 asking for assistance, and eighteen seconds later at 4:12.35 p.m. he indicated that Michael had been shot.

Plaintiff Juanita Estrada claims that the officers acted as the aggressors in this situation, charging across the yard in a matter of seconds, while Michael attempted to surrender. Plaintiff contends that Michael was frightened by the officers' movement and that just before he was shot, he dropped the knife and made a movement toward his right to hide behind one of the porch pillars. The Ludwigs' testimony supports this version of events, as both Mr. and Mrs. Ludwig believe that Michael dropped the knife before he was shot and that he was moving toward his right and the front porch pillar, not lunging toward the officers. Defendants, however, claim that Michael was not attempting to surrender, but rather was making an aggressive move towards the officers—that he came out of the door with the knife held over his head, refused to drop the knife, and then lunged at the police—and therefore, they were justified in using deadly force.

The police shot Michael six times. At least four of the bullets had a trajectory from back to front. One of the bullets entered Michael's chest and lodged in his left shoulder. After he was shot,

Michael was handcuffed and lay on the porch bleeding until paramedics arrived approximately twenty minutes later. The police did not provide any first aid or medical assistance to Michael, and they did not allow Michael's family members to approach him to provide any aid or comfort. Michael was pronounced dead at the hospital later that day.

## III.    DISCUSSION

### A.    Summary Judgment Standard of Review

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). "A fact is 'material' if under the substantive law it could have an effect on the outcome of the lawsuit. An issue is 'genuine' if 'a rational jur[or] could find in favor of the nonmoving party on the evidence presented.'" *Adams v. Am. Guarantee and Liab. Ins. Co.*, 233 F.3d 1242, 1246 (quoting *Equal Employment Opportunity Comm'n v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1190 (10th Cir.2000). The trial court must "view the evidence and draw reasonable inferences therefrom in the light most favorable to the non-moving party." *Simms v. Oklahoma ex rel. Dept's of Mental Health & Substance Abuse Serv.*, 165 F.3d 1321, 1326 (10th Cir. 1999). The movant—in this case, the Defendants—carries the burden of showing that no genuine issue of material fact exists. *Adams*, 233 F.3d at 1246; *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998). This burden "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the movant meets this initial burden, then the burden shifts to the non-moving party—Plaintiff Juanita Estrada—to find sufficient evidence that would warrant submission of the

case to a trier of fact. *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir.

1992). "Evidence is sufficient to withstand summary judgment if it is significantly probative and

would enable a trier of fact to find in the nonmovant's favor." *Adams*, 233 F.3d at 1246.

**B.     Fourth Amendment Excessive Force Claim**

Plaintiff Juanita Estrada brings this claim as the personal representative of the estate of

Michael Molina, arguing that the responding officers—Mark Dominguez, Horacio Rivera, and David

Cordova—used excessive force in violation of the U.S. Constitution when they shot and killed Mr.

Molina on December 26, 2006. "The use of deadly force is justified under the Fourth Amendment

if a reasonable officer in the Defendant's position would have had probable cause to believe that

there was a threat of serious physical harm to themselves or to others." *Phillips v. James*, 422 F.3d

1075, 1083 (10th Cir. 2005) (internal quotations omitted). In evaluating the reasonableness of the

officers' actions, the trial court cannot focus on the subjective perceptions or individual motivations

of the officers or the arrestee, but must determine whether the officers' actions were "objectively

reasonable in light of the facts and circumstances confronting them." *Graham v. Connor*, 490 U.S.

386, 397 (1989). This reasonableness test "requires careful attention to the facts and circumstances

of each particular case, including [1] the severity of the crime at issue, [2] whether the suspect poses

an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting

arrest or attempting to evade arrest by flight." *Id*. at 396. Furthermore, "[t]he 'reasonableness' of

a particular use of force must be judged from the perspective of a reasonable officer on the scene,

rather than with the 20/20 vision of hindsight" as "police officers are often forced to make split-

second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the

amount of force that is necessary in a particular situation." *Id*. at 396–97.

*1.    Severity of the Crime*

The seriousness of the crime depends in part upon what Michael Molina intended to do with the knife. If he was threatening to harm others with the knife—or if the officers reasonably believed that was the case—this would be a more serious offense than if he was merely acting disorderly and threatening to kill himself. *See Walker v. City of Orem*, 451 F.3d 1139, 1160 (10th Cir. 2006). The parties dispute how much information the responding officers had about circumstances at the Estrada residence before they arrived. Mr. Ludwig stated in his deposition that when he called 911 the third time, he indicated that Michael had picked up a knife and was threatening to kill himself. The incident details report from central dispatch shows that the dispatcher was advised that Michael had a knife, but it does not indicate whether this information was communicated to the officers or whether they were informed that Michael was suicidal. Officer Dominguez stated in his deposition that shortly before they arrived, the call was updated from a disorderly to a domestic—a more serious situation. Officer Rivera stated in his deposition that the call was for a disorderly person; however, in an earlier statement given to the Las Cruces Police Department, he had stated they were advised by dispatch en route that the situation was turning into a domestic. Officer Cordova also indicated in his statement to the Las Cruces Police Department following the incident that the call was updated to a domestic en route. Defendants argue that a domestic indicates that the suspect is behaving violently and causing harm to others. Nonetheless, Officer Cordova stated that a domestic can also indicate that someone is trying to hurt themselves. Thus, while a domestic undoubtedly indicates a more serious situation, this fact alone doesn't tell us whether the officers reasonably believed Michael posed a threat to others.

In *Walker*, the original dispatch reported that the suspect was a threat to others, but was later

updated to indicate that he merely posed a danger to himself, making the officers' use of force less

reasonable in the circumstances. *Id.* at 1144, 1160. In the case at hand, the record does not show

whether dispatch communicated to the officers that Michael was homicidal or suicidal. Mr. Ludwig

claims to have informed the dispatcher that he was suicidal, but if the officers were never informed,

then this fact should not be considered in determining whether they acted reasonably, as the Court

must consider the officers' actions "in light of the facts and circumstances confronting them."

*Graham*, 490 U.S. at 397. As the resolution of this issue would help determine whether or not the

officers' actions were objectively reasonable, and the parties dispute how much information the

responding officers possessed, this issue is material to the resolution of the case. However, this is

just one factor in the *Graham* test, and the officers may have been justified in the use of deadly force

even if they knew Michael was only threatening suicide. Therefore, the issue is not necessarily

genuine, as a reasonable juror could still find in favor of Defendants if the facts show that Michael

was suicidal. *Adams*, 233 F.3d at 1246; *Equal Employment Opportunity Comm'n*, 220 F.3d at 1190.

Thus, the Court must continue its analysis of the other factors.

2.      *Whether Mr. Molina Posed an Immediate Threat to Officers*

While it is clear that Michael Molina made some sort of movement that provoked the officers

to discharge their firearms, it is disputed whether Michael lunged from the porch at police with the

knife held over his head, or whether Mr. Molina was attempting to surrender, dropped the knife, and

then tried to jump behind a support pillar for protection. In order for an officer to be justified in the

use of deadly force, a suspect who is armed with a knife must make some sort of threatening

movement—charging, slicing, or stabbing at the officer. *See Zuchel v. City & County of Denver*, 997

F.2d 730, 735–36 (10th Cir. 1993)). If Michael moved to drop the knife or take shelter from the

advancing officers, this would not be sufficient to justify the use of deadly force. Consequently, there is a genuine issue of material fact with respect to whether Michael posed an imminent threat to the officers at the moment they exercised deadly force. *See Sevier v. City of Lawrence*, 60 F.3d 695, 700–01 (10th Cir. 1995) ("some evidence showed that [suspect] did not lunge at [officer] with a knife, and, thus, that highly material fact is in dispute").

In deciding whether a suspect represented an imminent threat, the trial court must limit its inquiry to "whether the officer was in danger at the moment of the threat." *Wilson v. Meeks*, 52 F.3d 1547, 1554 (10th Cir. 1995) (citing *Fraire v. City of Arlington*, 957 F.2d 1268, 1276 (5th Cir. 1992)), *abrogated on other grounds by Saucier v. Katz*, 533 U.S. 194, 205 (2001); *see also Sevier*, 60 F.3d at 699. Defendants argue that *Wilson v. Meeks* presents a similar situation to the case at hand. In *Wilson*, the Tenth Circuit found that the defendant officer had acted reasonably in the circumstances, stating that "[a]ny police officer in [defendant's] position would reasonably assume his life to be in danger when confronted with a man whose finger was on the trigger of a .357 magnum revolver pointed in his general direction." *Wilson*, 52 F.3d at 1554. The two cases are similar in that Mr. Wilson was standing on his front porch when he was shot by an officer standing in his front yard. There is, however, an important distinction between the two cases: Mr. Wilson was wielding a .357 magnum, whereas, Mr. Molina was wielding a large kitchen knife. When a suspect is wielding a gun, the danger to the officer is more immediate because he can be struck from a greater distance than with a knife, and for that reason, it is reasonable for an officer to respond more immediately with deadly force. *Compare Thomson v. Salt Lake County*, 584 F.3d 1304, 1318 (10th Cir. 2009) (finding that officers were justified in using deadly force where suspect was suicidal and pointing the gun at himself and officers) *with Walker*, 451 F.3d at 1159–61 (finding that officers were not

justified in using deadly force where suspect was threatening suicide with a box cutter).

In assessing the degree of threat facing an officer, the Court may consider several non-exclusive factors, including: "(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect." *Larsen*, 511 F.3d at 1260. Both parties agree that Defendants told Mr. Molina to drop the knife. While Mr. Molina initially failed to comply with the officers' demands, Mr. and Mrs. Ludwig have stated that they believe Michael dropped the knife before he was shot. Thus, if we take the facts in the light most favorable to Plaintiff, Michael Molina complied with the officers' commands, and he had already dropped the knife when he was shot. Plaintiff Juanita Estrada also presents evidence that from the time the officers began to advance across the yard, until the time shots were fired, only four seconds elapsed. Mrs. Estrada argues that this short time period did not give Michael sufficient time to comply with the officers' commands and drop the knife. Instead, Mrs. Estrada argues that Defendants acted as the aggressors.

The second factor—whether any hostile motions were made towards the officers—can also be resolved in favor of Plaintiff. If we view the facts in the light most favorable to Plaintiff, Mr. Molina did not make any hostile motions towards the officers, but instead, he was surrendering to the officers and attempting to seek shelter behind the porch pillar. Defendants characterize Michael Molina's holding of the knife above his head as a threatening gesture, but Plaintiff Juanita Estrada argues that Michael had both arms above his head in a show of surrender to the police.

There is also some dispute as to how far away Michael was from the police when they discharged their firearms. While both parties agree that officers were approximately twenty feet

12

away from Mr. Molina when they fired their weapons, Defendants claim that the distance was less than twenty feet, while Plaintiff claim that it was more than twenty feet. If we take the evidence in the light most favorable to the nonmoving party, even if Michael were lunging forward as the officers claim, a jury might reasonably conclude that he did not pose an immediate threat to the safety of the three officers who were standing more than twenty feet away, and all of whom had their weapons drawn and trained on Mr. Molina. Generally, a knife-wielding suspect over twenty-one feet away is not considered an imminent threat. *See Estate of Larsen v. Murr*, 511 F.3d 1255, 1258–60 (10th Cir. 2008); *Walker*, 451 F.3d at 1144–45 (finding no threat where officers shot from distances of twenty to twenty-five feet and twenty-eight feet). However, "[i]n assessing objective reasonableness, we employ no bright line rules, and in a totality of the circumstances analysis, distance is but one factor of many." *Larsen*, 511 F.3d at 1262.

It is also notable that it was the officers who closed the distance on Mr. Molina. The testimony of Mr. and Mrs. Ludwig indicates that once Michael exited the house, he remained on the front porch, which was more than forty-six feet away from the sidewalk where the officers were standing. The reasonableness of Defendants' actions depends in part "on whether Defendants' own reckless or deliberate conduct during the seizure unreasonably created the need to use such force." *Sevier*, 60 F.3d at 699, 701 n. 10 ("record reveals some evidence upon which a jury could conclude that Defendants acted recklessly by confronting [the suspect] in the manner that they did after knowing that he was armed and distraught . . . , and without gathering more information on the situation"); *see also Jiron v. Lakewood*, 392 F.3d 410, 418–19 (10th Cir. 2004). In other words, the Court must look not only at whether the officers were in imminent danger at the moment they acted, but also whether the officers potentially acted recklessly or deliberately in creating the dangerous

situation. The officers rapidly advancing on Mr. Molina with their weapons drawn may have caused him to react suddenly and dive behind the pillar out of fear, which in turn caused the officers to discharge their weapons. Defendants have not explained why they continued to advance toward Mr. Molina to within a distance where they felt that Michael posed an imminent threat to their safety, and they have not explained why they did not give Mr. Molina more time to comply with their demands to drop the knife.

The fourth factor—the manifest intentions of the suspect—can also be resolved in favor of Plaintiff. As previously noted, Michael had threatened to kill himself, not anyone else in the house. Defendants have not alleged that Michael made any threats to the people inside the house, or that he planned to escape from the house and harm members of the public. Therefore, Michael's manifest intentions were not necessarily indicative of an intent to harm others.

Taking the evidence in the light most favorable to Plaintiff and applying the four *Larsen* factors to the case at hand, the level of threat facing the officers at the moment they fired their weapons may not have been sufficiently imminent to justify their use of deadly force. *Larsen* is an important case in the Court's analysis, both for its similarities and differences. In *Larsen*, the Tenth Circuit stated that it was "a prototypical case where police officers were forced to make split-second judgments, and even if [the officers'] assessment of the threat was mistaken, it was not objectively unreasonable." *Larsen*, 511 F.3d at 1261. While there are similarities between *Larsen* and the case at hand, there are also important differences. The knife in *Larsen* was described as "a small sword" with a "blade over a foot in length." *Id*. at 1258, 1260. While the weapon in the case at hand was definitely more than a "mere pocket knife or razor blade," its blade was only about seven inches in length. *Id*. at 1260. Additionally, Larsen had clearly threatened violence against others, whereas,

14

Mr. Molina had only threatened to harm himself. The call in *Larsen* came late at night; the call in this case came during the daytime. Also, Larsen "held the high ground vis-a-vis the officers," standing three to four feet above the officers on his front porch, and he was closer to the officers. *Id.* at 1260–61. And, Larsen's actions were more immediately and objectively threatening. Larsen appeared clearly agitated, raised the knife above his head in a striking position, and then turned and took a step toward one of the officers standing on the sidewalk below. *Id.* at 1258. Based on the undisputed facts and the totality of the circumstances, the Tenth Circuit found that the officer's use of deadly force in *Larsen* was objectively reasonable. *Id.* at 1263.

In the case at hand, there are several disputed facts; and therefore, the totality of the circumstances do not conclusively show that Mr. Molina's actions were threatening. In *Larsen*, the Court stated that "a minor discrepancy does not amount to a dispute of material fact for the jury precluding summary judgment," pointing to discrepancies in the officers' depositions and descriptions of the distance between the suspect and police. *Id.* at 1261. In the case at hand, Defendants also argue that the factual disputes between the parties are not material. Defendants, for example, argue that due to the position of the front porch pillar, even if Mr. Molina were attempting to duck behind the pillar rather than lunging toward the officers, he would have been moving forward, and therefore, this issue is not material. While this argument is compelling, it does not explain the testimony of both William and Hilaria Ludwig, who had a perspective from directly behind the officers and stated that Michael was moving to his right, not forward. Also, it does not address the issue of whether Michael had dropped the knife before he was shot, as the Ludwigs' testimony suggests. These factual disputes represent more than "minor discrepancies."

Finally, Defendants argue that even if their interpretation of Michael Molina's actions was

15

mistaken, and their lives were not in danger, provided they had a reasonable but mistaken belief that their actions were justified under the circumstances, they did not violate Mr. Molina's constitutional rights. *Saucier v. Katz*, 533 U.S. 194, 206 (2001), *overruled on other grounds by Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009) (finding the rigid two-step procedure for qualified immunity analysis required by *Saucier* is not mandatory).  Where a suspect points an unloaded gun at an officer, for example, although the officer's life might not be in jeopardy, it is reasonable for him to believe it is. *See Wilson*, 52 F.3d 1547.  In the case at hand, if we view the evidence and draw reasonable inferences therefrom in the light most favorable to Plaintiff—(1) that Mr. Molina was not threatening harm to anyone but himself; (2) that Mr. Molina was indeed surrendering and dropping the knife when officers fired on him; (3) that he was not lunging at the officers, but rather moving to his right to seek shelter behind the porch pillar; (4) that the officers were at least twenty feet away when they fired on Mr. Molina; and (5) that the officers did not fire until after Mr. Molina had dropped the knife—then the officers did not have a reasonable but mistaken belief that their actions were justified.  This case presents several genuine issues of material fact that should be resolved by a trier of fact, not the Court.  Furthermore, Plaintiff Juanita Estrada has carried her burden of presenting sufficient evidence such that a reasonable jury could find in her favor. *See Adams*, 233 F.3d at 1246.

### 3.    Whether Mr. Molina Was Resisting Arrest

Under the third and final *Graham* factor—whether the suspect was resisting arrest—there are also several factual disputes.  Plaintiff Juanita Estrada argues that because Michael came out of the Estradas' house to meet the police on the front porch instead of running out the back door, Michael was attempting to surrender, not flea.  Additionally, Mrs. Estrada argues that Michael had

placed his hands above his head in an unmistakable act of surrender, and that before he was shot,

Michael had dropped the knife. Defendants, on the other hand, allege that when Mr. Molina was

ordered by the police to drop the knife, he refused to do so, stating "I'm not dropping shit." In a

summary judgment motion, it is the moving party that bears the burden of showing an absence of

genuine issues of material fact. *Celotex*, 477 U.S. at 323. Defendants have not carried this burden.

There is conflicting evidence that puts the issues of the seriousness of the crime, whether Michael

posed an immediate threat to the officers, and whether Michael was resisting arrest into question.

### 4.    *Qualified Immunity*

Defendants assert qualified immunity as a defense to Plaintiff Juanita Estrada's Fourth

Amendment claim of excessive force. To overcome a defense of qualified immunity Plaintiff must

show (1) that if her allegations are accepted as true, they adequately allege a violation of Mr.

Molina's constitutional rights, and (2) that the constitutional right was clearly established at the time

of the alleged unlawful activity. *Saucier*, 533 U.S. at 201; *Fisher v. City of Las Cruces*, 584 F.3d

888, 893 (10th Cir. 2009). Qualified immunity shields "government officials performing

discretionary functions . . . from liability for civil damages insofar as their conduct does not violate

clearly established statutory or constitutional rights of which a reasonable person would have

known," and in doing so, it is designed to protect public officials "from undue interference with their

duties and from potentially disabling threats of liability." *Harlow v. Fitzgerald*, 457 U.S. 800, 818

(1982). In the case at hand, there exist several genuine issues of material fact as to whether the

officers violated Mr. Molina's right to be free from the excessive use of force; however, taking

Plaintiff's allegations as true, it appears they adequately allege a violation of Mr. Molina's

constitutional rights. Furthermore, it has been "specifically established" in the Tenth Circuit "that

where an officer had reason to believe that a suspect was only holding a knife, not a gun, and the suspect was not charging the officer and had made no slicing or stabbing motions toward him, that it was unreasonable for the officer to use deadly force against the suspect." *Walker*, 451 F.3d at 1160 (citing *Zuchel*, 997 F.2d at 735–36). Whether or not Mr. Molina was charging the officers is disputed by the parties. However, if we take Plaintiff's allegations as true—that Mr. Molina was not charging Defendants, but attempting to surrender—they adequately allege the violation of a constitutional right.

When determining whether a prior Tenth Circuit case clearly establishes a constitutional right, it is not necessary that the facts of the cases be identical; however, "they must be sufficiently analogous to satisfy the particularized context necessary to support liability." *Mecham v. Frazier*, 500 F.3d 1200, 1206 (10th Cir. 2007). *Walker*, *Zuchel*, and *Larsen* provide factually similar situations to the case at hand and establish the contours of the right at issue—when deadly force can and cannot be used against a knife-wielding suspect—such that it should have been clear to a reasonable officer in the Defendants' position whether or not the use of deadly force against Mr. Molina was lawful. *See Cortez v. McCauley*, 478 F.3d 1108, 1114 (10th Cir. 2007).

### C.    Failure to Render Medical Aid

Defendants request that the Court dismiss Plaintiff Juanita Estrada's claims for failure to render medical assistance to Michael Molina, arguing that where officers have summoned aid, but fail to personally assist a suspect, there is no constitutional violation. *Wilson*, 52 F.3d at 1555. Mrs. Estrada does not argue that Defendants failed to summon aid and has cited no contrary authority. In *Wilson*, the Tenth Circuit refused to recognize an affirmative duty on the part of officers to provide first aid. *Id.* at 1556. "Few citizens would be likely to want police officers to render medical

aid. Such steps are best left to the qualified and highly trained personnel who act as paramedics or EMTs." *Id.* at 1555–56. Defendants have carried their initial burden of showing no genuine issue of material fact, and Mrs. Estrada has failed to present sufficient evidence that would warrant submission of this issue to a trier of fact. Because Plaintiff has failed to show a violation of any legal right, Defendants are entitled to judgment as a matter of law. Thus, the Court finds that Defendants discharged any constitutional duty to provide medical aid to Michael Molina when they summoned paramedics to the scene, and Defendants' Motion for Summary Judgment as to this claim is granted.

### D.    Conspiracy Claim

Plaintiff Juanita Estrada also brings an action against Defendants for conspiracy to deprive her of her due process rights by "allowing evidence to be lost, and rendition of events to be modified by permitting the three Police Officers . . . to meet and confer with one another, then with the union representative and criminal defense attorney, together and prior to their individual statements being taken by investigating detectives." (Pls.' Amended Compl. ¶ 54.) In essence, Mrs. Estrada claims that Defendants engaged in a "cover-up" of the shooting to avoid civil liability. Plaintiff Juanita Estrada alleges the following facts in support of this theory: (1) the three officers did not give their statements until 24 hours after the shooting; (2) before they gave their statements, the officers were allowed to talk to a union representative and a criminal defense attorney; (3) the officers were permitted to meet with Detective Molenda, who was assigned to investigate the case, and walk through the scene of the shooting before giving a statement; and (4) the officers' descriptions of the events in their statements were remarkably similar to each other.

A civil conspiracy is "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an

agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage." *Rotermund v. United States Steel Corp.*, 474 F.2d 1139 (8th Cir.1973) (internal citations and quotations omitted); *see also Singer v. Wadman*, 745 F.2d 606, 609 (10th Cir. 1984). A conspiracy claim may be brought under § 1983. *Hunt v. Bennett*, 17 F.3d 1263, 1266 (10th Cir.1994). "However, a plaintiff must allege specific facts showing an agreement and concerted action amongst the defendants." *Tonkovich v. Kansas Bd. of Regents*, 159 F.3d 504, 533 (10th Cir.1998). "Conclusory allegations of conspiracy are insufficient to state a valid § 1983 claim." *Hunt*, 17 F.3d at 1266 (quoting *Durre v. Dempsey*, 869 F.2d 543, 545 (10th Cir.1989)). It is not clear that Plaintiff has met this burden. Plaintiff Juanita Estrada has not produced any evidence indicating a specific agreement or concerted action amongst the Defendants. While permitting Defendants to converse with their attorneys, the union representative, Detective Molenda, and possibly each other certainly may have given them the opportunity to conspire, such allegations by themselves do not prove an agreement or concerted action by the Defendants. In other words, Plaintiff's allegations are conclusory.

Defendants do not contest Plaintiff Juanita Estrada's factual allegations; instead, Defendants argue that, even if the facts are viewed in the light most favorable to Plaintiff, she has failed to present sufficient evidence to support her claim, and therefore, judgment as a matter of law is appropriate. *See Celotex*, 477 U.S. at 325 (finding that moving party may meet its burden by indicating "there is an absence of evidence to support nonmoving party's case"). Defendants argue that it is standard policy of the police department to open an investigation into every incident involving the discharge of a firearm, and to make an attorney available to officers during this type of employee interrogation. Defendants argue that these policies and procedures in no way infringed

upon Plaintiff Juanita Estrada's constitutional right of due process.

In *Wilson*, the Tenth Circuit observed that "[o]ther circuits have recognized a cause of action for cover-up,"[1] but the Court refused to do so under the facts of the case. 52 F.3d at 1557. The plaintiff had cast her cause of action as a deprivation of her due process right of access to the courts under the Fourteenth Amendment. *Id.* at 1556. The Court found that in order to bring a § 1983 claim against the officers for an alleged cover-up, "plaintiffs must set forth a clearly established duty to support their claim," and the Tenth Circuit "has never created such a duty." *Id.* at 1557. Similarly, in the case at hand, Plaintiff Juanita Estrada's claim must fail, as the Tenth Circuit has never recognized that police departments have a constitutional duty to sequester police officers or prevent them from consulting with a defense attorney prior to giving a statement in a police investigation.

Circuits that have recognized a cause of action for a police cover up have found that this right arises under the Fourteenth Amendment right to due process which provides a right of access to the courts. *Armstrong v. Manzo*, 380 U.S. 545, 552; *Boddie v. Connecticut*, 401 U.S. 371; *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 437. In *Bell v. City of Milwaukee*, the Seventh Circuit concluded that when "police officials shield from the public and the victim's family key facts which would form the basis of the family's claims for redress," their constitutional right of access to the courts is diminished. 746 F.2d 1205, 1261 (7th Cir. 1984), *overruled on other grounds by Russ v. Watts*, 414 F.3d 783, 783–84 (7th Cir. 2005). "A contrary interpretation of the right to due process would encourage police officials to conceal the circumstances relating to unlawful killings . . . ." *Id.* While this argument is compelling, the Tenth Circuit affirmatively rejected this interpretation.

---

[1] *See, e.g., Williams v. City of Boston*, 784 F.2d 430, 435 (1st Cir. 1986); *Bell v. City of Milwaukee*, 746 F.2d 1205 (7th Cir. 1984); *Ryland v. Shapiro*, 708 F.2d 967 (5th Cir. 1983).

*Wilson*, 52 F.3d at 1557. In *Wilson*, the district court concluded, "If the officers kept plaintiffs from having a meaningful access to the courts through a conspiracy and code of silence, then their actions were not reasonable." *Id.* The Tenth Circuit Court of Appeals, however, reversed the district court's decision, finding that the facts of the case did not show a violation of the plaintiffs' constitutional rights. *Id.* at 1558.

Plaintiff Juanita Estrada has failed to produce any evidence indicating that there was a violation of her Fourteenth Amendment constitutional right of access to the courts. While sequestering officers might lead to more truthful and accurate statements, there is no constitutional requirement that police departments conduct their investigations in this way. Furthermore, police officers have a corresponding constitutional right to seek the assistance of counsel before making a statement, or to refuse to make a statement altogether. This right must be balanced against a plaintiff's Fourteenth Amendment right of access to the courts. In the case at hand, Mrs. Estrada has not produced evidence indicating the existence of a conspiracy to deprive her of her constitutional right of access to the courts sufficient to warrant submission of the matter to a trier of fact. Therefore, summary judgment as to Plaintiff Juanita Estrada's § 1983 conspiracy claim is granted.

### E.    Claims Against John Doe Supervisory Officers

Plaintiff Juanita Estrada asserts claims against unnamed John Doe Supervisory Officers of the City of Las Cruces "based upon the negligent hire, negligent or failure to supervise, and negligent or failure to properly train the three officers." (Pls.' Amended Compl. ¶ 50.) In order to assert a § 1983 claim against a supervisory officer, "plaintiff must establish a 'deliberate, intentional act by the supervisor to violate constitutional rights.'" *Jenkins v. Wood*, 81 F.3d 988, 994–95 (10th Cir. 1996) (quoting *Woodward v. City of Worland*, 977 F.2d 1392, 1399 (10th Cir. 1992)); *see also City*

*of Canton v. Harris*, 489 U.S. 378, 389 (1989). Mrs. Estrada broadly claims that certain unidentified John Doe Supervisory officers were responsible for the alleged violations of Mr. Molina's constitutional rights. As Plaintiff has made no showing that any individual "defendant-supervisor personally directed the violation or had actual knowledge of the violation and acquiesced in its continuance," this claim against the unnamed supervisors is dismissed. *Jenkins*, 81 F.3d at 995 (citing *Woodward*, 977 F.2d at 1400). There is simply no evidence from which a reasonable jury could find a deliberate, intentional act on the part of the unnamed supervisors; therefore, Defendants' Motion for Summary Judgment is granted with respect to the claims against the unnamed John Doe Supervisory Officers.

### F.    Claims Against the City of Las Cruces

Plaintiff Juanita Estrada also brings a claim against the City of Las Cruces for damages resulting from "a 'custom' of negligent hire, negligent or failure to supervise, and negligent failure to provide adequate training to police officers who encounter mentally impaired individuals in the criminal process or in the community caretaker process." (Pls.' Amended Compl. ¶ 53.) In *Monell v. New York City Dept. of Soc. Servs.*, the U.S. Supreme Court found that under § 1983 a municipality may not be held liable under a theory of *respondeat superior* or vicarious liability for the acts of its officers. 436 U.S. 658, 694–95 (1978). Thus, the simple act of employing someone who violates another's constitutional rights is not sufficient for municipal liability under § 1983. Instead, the plaintiff must show that the municipality itself was responsible for the constitutional violation due to a specific government policy or custom. *Id.*; *City of Canton*, 489 U.S. at 385. Therefore, in order for Plaintiff Juanita Estrada's claim to survive Defendants' Motion for Summary Judgment, this Court must find that she has presented sufficient evidence demonstrating "a direct

causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton*, 489 U.S. at 385.

Defendants argue that summary judgment is appropriate in the case at hand because (1) Plaintiff has failed to show that an officer committed a constitutional violation, and (2) Plaintiff has not identified a policy or custom that caused Mr. Molina's alleged injury. *See Larsen*, 511 F.3d at 1264 ("A § 1983 suit against a municipality for the actions of its police officers requires proof that (1) an officer committed a constitutional violation and (2) a municipal policy or custom was the moving force behind the constitutional deprivation that occurred." ); *Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 403 (1997); *Jiron*, 392 F.3d at 419.  As previously discussed, summary judgment with regard to Mrs. Estrada's excessive force claim is not proper because there are genuine issues of material fact as to whether the officers exercised excessive force in subduing Mr. Molina, and when viewed in the light most favorable to Plaintiff, a reasonable jury could find the officers violated Mr. Molina's constitutional right to be free from the use of excessive force.  Therefore, summary judgment is not appropriate based on Defendants' first argument that Plaintiff Juanita Estrada failed to show a constitutional violation.  We therefore move on to address Defendants' second argument, that Plaintiff failed to identify a policy or custom that led to the officers' excessive use of force.

### 1.    *Deficiencies in the Hiring Process*

Plaintiff Juanita Estrada has failed to identify a specific policy or custom leading to any deficiencies in the hiring process.  Mrs. Estrada has characterized Officer Rivera as "aggressive;" however, she has not produced any evidence that his hiring was the result of a lack of scrutiny of his background before he was hired or some other oversight by the Las Cruces Police Department.

24

In order to hold a municipality liable for a hiring decision, plaintiff must show that the review of the applicant's record was inadequate. *See Brown*, 520 U.S. at 410. However, this is just the first step. "To prevent municipal liability for a hiring decision from collapsing into *respondeat superior* liability, a court must carefully test the link between the policymaker's inadequate decision and the particular injury alleged." *Id.* Thus, while § 1983 liability based on inadequacies in the hiring process is possible, it only applies in very limited circumstances. In *Brown*, the U.S. Supreme Court required that a plaintiff show "deliberate indifference" on the part of municipal policymakers that a "violation of a particular constitutional or statutory right will follow the decision." *Id.* at 411. "Only where . . . the plainly obvious consequence of the decision to hire the applicant would be the deprivation of a third party's federally protected right can the official's failure to adequately scrutinize the applicant's background constitute 'deliberate indifference.'" *Id.* In other words, liability "must depend on a finding that *this* officer was likely to inflict the *particular* injury suffered by the plaintiff." *Id.* at 412. This is a difficult standard to meet.

Plaintiff Juanita Estrada must produce evidence such that a reasonable jury could find that had the Las Cruces Police Department performed an adequate background check on the officers, it "should have concluded that [their] use of excessive force would be a plainly obvious consequence of the hiring decision." *Id.* Mrs. Estrada has produced no evidence indicating this was the case, or indicating any particular policy or custom on the part of the municipality with regard to background checks. Plaintiff's conclusory allegations—that because the officers were aggressive or substandard officers, the City of Las Cruces should be liable for hiring them—are insufficient to state a constitutional violation. *Norton v. The City Of Marietta*, 432 F.3d 1145, 1155 (10th Cir. 2005) ("conclusory allegation . . . insufficient to state a constitutional claim against the City"); *Hinton v.*

*Franck*, No. Civ. 00-1142, 2000 WL 1846195, at *4 (10th Cir. Dec. 18, 2000) ("vague, conclusory

claims cannot withstand summary judgment"). Allowing such a claim to go forward would be

tantamount to permitting *respondeat superior* liability for municipalities. Therefore, Defendants'

Motion for Summary Judgment is granted with respect to Plaintiff Juanita Estrada's claim of

deficiencies in the hiring process.

### 2. *Failure to Supervise*

Plaintiff Juanita Estrada brings this claim against the City of Las Cruces for its failure to

supervise its officers, alleging that the Professional Standards Unit of the Las Cruces Police

Department has a history of not following up and investigating civilian complaints of excessive force

by officers. Mrs. Estrada alleges that Officer Rivera was an "aggressive officer" who had been

investigated by the Professional Standards Unit several times, and that some of these investigations

were for allegations of "excessive force" made by citizens. In his deposition, Officer Rivera stated

that fewer than a dozen claims of excessive force had been made against him by civilians, that the

claims were investigated by the Professional Standards Unit, and that none of the claims were found

to have merit. Additionally, Chief Romero of the Las Cruces Police Department stated in his

deposition that he did not recall any excessive force complaints that had been substantiated by the

Professional Standards Unit during 2006, 2007, or 2008. Plaintiff would argue that this proves the

City has a policy or custom of ignoring complaints of excessive force against officers and allowing

these officers to continue serving without any disciplinary actions.

Defendants do not dispute Plaintiff Juanita Estrada's factual allegations. Instead, Defendants

argue that summary judgment is appropriate because Mrs. Estrada failed to identify a policy or

custom that led to the alleged constitutional violation. An official policy may be either "a policy

statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell*, 436 U.S. at 690. A custom is "an act that, although not formally approved by an appropriate decision maker, has such widespread practice as to have the force of law." *Marshall v. Columbia Lea Reg'l Hosp.*, 345 F.3d 1157, 1177 (10th Cir. 2003). "[T]he word 'policy' generally implies a course of action consciously chosen from among various alternatives" and "considerably more proof than [a] single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the 'policy' and the constitutional deprivation." *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24 (1985). Therefore, in order to show that a municipality is pursuing a policy or custom of ignoring complaints of excessive force and allowing aggressive and incompetent officers to continue working with the public requires that evidence be adduced of continued and deliberate actions by the municipality. *Tuttle*, 471 U.S. at 823.

Officer Cordova's record—which shows a history of less than a dozen complaints—does not present proof of a policy or custom, as the hiring of one "bad apple" is not enough to impose liability. *See id.* at 821. Furthermore, Chief Romero's statement that he did not recall any excessive force complaints that had been substantiated in the last three years does little to corroborate Plaintiff Juanita Estrada's claim. Mrs. Estrada has failed to meet her burden of producing evidence of an official policy or custom by the municipality that led Las Cruces Police Department officers to use excessive force. *See Wichita Coca-Cola Bottling Co.*, 968 F.2d at 1024. Plaintiff's bare allegations standing alone do not warrant submission of the claim to a trier of fact; therefore, Defendants' Motion for Summary Judgment is granted with respect to Plaintiff Juanita Estrada's claim of failure to supervise.

3.    *Failure to Adequately Train*

Plaintiff Juanita Estrada further alleges that the Las Cruces Police Department's Officer Training Program is deficient because the Department allows substandard officers, such as Officer Rivera, to participate in the training of cadets.  To support this allegation, Mrs. Estrada cites to the deposition of Chief Romero of the Las Cruces Police Department, who stated that he "believes that training officers should have ten years experience to be well seasoned."  Officer Rivera, who was responsible for shadowing and training Officer Cordova, allegedly only had three years, six months experience.

In order to hold a municipality liable for an inadequate police training program under § 1983, plaintiff must first show that the training of the police officers was inadequate. *City of Canton*, 489 U.S. at 390.  Mrs. Estrada specifically alleges that the municipality failed to provide adequate training to police officers on how to deal with mentally impaired individuals they encounter as part of their job.  Thus, Plaintiff Juanita Estrada's claim is not that the Police Department's training was incorrect, but rather, it was nonexistent or inadequate.  "[A] policy of not taking reasonable steps to train its employees" can also represent a municipal policy—a policy of inaction. *Id.*  However, where an "inaction theory rests on an alleged failure to train, the plaintiff must prove 'the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need' for additional training." *Jenkins*, 81 F.3d at 994 (quoting *City of Canton*, 489 U.S. at 389); *see also Tuttle*, 471 U.S. at 823 ("evidence [must] be adduced which proves that the inadequacies resulted from conscious choice—that is, proof that the policymakers deliberately chose a training program which would prove inadequate").

28

In determining whether there was a need for more training, the trial court must focus on the adequacy of the training in light of the particular tasks that the officer must perform. *City of Canton*, 489 U.S. at 390–91. In other words, the Court must determine whether "the use of force arose under circumstances that constitute a usual and recurring situation with which police officers must deal." *Carr v. Castle*, 337 F.3d 1221, 1228 (10th Cir. 2003) (citing *City of Canton*, 489 U.S. at 388). While the decision whether or not to use deadly force on a mentally disturbed, armed suspect is hopefully not a usual or recurring situation for most police officers, it is one that most officers will likely encounter in their professional careers, and it is one that "city policymakers know to a moral certainty" that their officers will confront. *City of Canton*, 489 U.S. at 390 n. 10. "Thus, the need to train officers in the constitutional limitation on the use of deadly force . . . can be said to be so obvious, that failure to do so could properly be characterized as deliberate indifference to constitutional rights." *Id.* (internal quotations and citation omitted).

However, Plaintiff Juanita Estrada has not shown that the training received by Las Cruces police officers is inadequate or that this type of training is below generally accepted standards in other police departments. *See Zuchel*, 997 F.2d at 739. While it is Chief Romero's belief that training officers should have ten years experience before they are well seasoned enough to train others, Mrs. Estrada has not alleged that the Las Cruces Police Department's policies differ from that of other police departments. Indeed, no evidence has been presented to the Court by either party relating to how, or if, the Las Cruces Police Department trains its officers in the use of deadly force. To prevail on a motion for summary judgment plaintiff must point to evidence showing the "substance of the County's training policies or procedures or the alleged inadequacies of any such policy." *Stuart v. Jackson*, Nos. 00-1295, 00-1307, 24 F. App'x 943, 956 (10th Cir. Dec. 17, 2001)

(affirming district court's grant of summary judgment where plaintiff failed to "demonstrate how any of the County's training policies were inadequate" and "deliberately indifferent to the rights of its citizens"). Plaintiff Juanita Estrada has not provided sufficient evidence to substantiate her claim that a municipal policy or custom led to the inadequate training of its officers and Mr. Molina's ultimate injury. Therefore, with respect to Plaintiff's claim that the City of Las Cruces inadequately trained its police officers, Defendants' Motion for Summary Judgment is granted.

F.    **State Law Claims**

In their Memorandum in Reply, Defendants for the first time argue that the Court should grant summary judgment as to Plaintiff Juanita Estrada's state law claims. Generally, a district court will not consider granting summary judgment for a claim where movant argues for the first in its memorandum in reply that summary judgment is appropriate. *See, e.g.*, *State Farm Fire & Cas. Co. v. Mhoon*, 31 F.3d 979, 984 n. 7 (10th Cir. 1994) (finding that failure to raise issue in opening brief constitutes waiver); *Taylor v. United Management, Inc.*, 51 F. Supp. 2d 1212, 1215 (D.N.M. 1999) (finding claim untimely when raised for the first time in reply brief); *Employers Mut. Cas. Co. v. Miner*, 6 F. Supp. 2d 1232, 1236 n. 5 (D. Kan. 1998) ("court will not grant summary judgment based on an issue raised for the first time in a reply brief"). Defendants argue, however, that this Court should consider granting summary judgment on the state claims because Plaintiff Juanita Estrada did not articulate these claims in either the Joint Status Report or her Response. While some courts have found that stipulations made in a joint status report may constitute waiver, this Court did not find any authority for the proposition that failure to raise a claim in a joint status report constitutes waiver. *See Dickson Industries, Inc. v. Patent Enforcement Team, L.L.C.*, Nos. 2008-1372, 2008-1398, 333 F. App'x 514, 516 (10th Cir. May 20, 2009) (finding that any further objection

regarding personal jurisdiction was waived in joint status report which stipulated to the fact that court had jurisdiction over the matter); *Kam-Ko Bio-Pharm Trading Co. Ltd-Australasia v. Mayne Pharma (USA) Inc.*, 560 F.3d 935, 942–43 (9th Cir. 2009) (finding that right to a jury trial was waived in joint status report which stated that "[n]o party has requested, or intends to request a jury as to any issue").

Furthermore, Plaintiff Juanita Estrada would have had no reason to articulate the state law claims in her responsive pleading if Defendants did not raise the issue in their Memorandum in Support of Motion for Summary Judgment. "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. As Defendants failed to meet this initial burden, the Court will not now consider their arguments for summary judgment with regard to Plaintiff Juanita Estrada's state law claims. Therefore, Defendants' Motion for Summary Judgment with regard to Plaintiff's state law claims is denied.

## IV.    CONCLUSION

Defendants' Motion for Summary Judgment with regard to Plaintiff's Fourth Amendment claim of excessive force is DENIED as there are genuine issues of material fact which should be resolved by a trier of fact. Furthermore, Defendants' are not entitled to qualified immunity because (1) if Plaintiff's allegations are taken as true they adequately allege a violation of Michael Molina's constitutional right to be free from excessive force, and (2) this constitutional right was clearly established at the time of the alleged unlawful activity.

Defendants' Motion for Summary Judgment with regard to Plaintiff's claim that the officers failed to render medical aid is GRANTED. Defendants discharged any constitutional duty to provide medical aid to Michael Molina when they summoned paramedics to the scene.

Defendants' Motion for Summary Judgment with regard to Plaintiff's claim that Defendants engaged in a conspiracy to deprive her of her Fourteenth Amendment due process rights is GRANTED. While other circuits have recognized a § 1983 cause of action for a police cover-up, the Tenth Circuit has not. Furthermore, Plaintiff failed to produce evidence indicating the existence of a conspiracy sufficient to warrant submission of the matter to a trier of fact.

Defendants' Motion for Summary Judgment with regard to Plaintiff's claim that the John Doe Supervisory Officers negligently hired, failed to supervise, and failed to properly train the three officers is GRANTED. In order to assert a § 1983 claim against a supervisory officer, a plaintiff must provide evidence that the supervisor acted deliberately and intentionally to violate someone's constitutional rights. There is simply no evidence in the case at hand from which a reasonable jury could find a deliberate, intentional act on the part of the unnamed supervisors.

Defendants' Motion for Summary Judgment with respect to Plaintiff's claim against the City of Las Cruces for deficiencies in the hiring process is GRANTED. Plaintiff failed to produce any evidence such that a reasonable jury could find that the officers should not have been hired because had the Las Cruces Police Department performed an adequate background check it would have concluded that hiring them would likely result in the violation of someone's constitutional rights.

Defendants' Motion for Summary Judgment with respect to Plaintiff's claim against the City of Las Cruces for its failure to supervise its officers is GRANTED. Plaintiff claims that the Professional Standards Unit of the Las Cruces Police Department has a history of not investigating

civilian complaints of excessive force by its officers, but failed to produce evidence that would warrant submission of the matter to a trier of fact.

Defendants' Motion for Summary Judgment with regard to Plaintiff's claim that the City of Las Cruces Officer Training Program failed to adequately train its officers is GRANTED. Plaintiff failed to provide any evidence of the substance of the Police Department's training policies or procedures with regard to the use of deadly force, or any evidence that the City of Las Cruces deliberately chose a training program which was inadequate.

Defendants' Motion for Summary Judgment with regard to Plaintiff's state law claims is DENIED. The party seeking summary judgment bears the initial responsibility of informing the district court of the basis for its motion, and Defendants did not argue that the Court should grant summary judgment as to Plaintiff's state law claims until their Memorandum in Reply. The Court will not grant summary judgment on an issue raised for the first time in a reply brief.

## ORDER

**WHEREFORE,**

A Memorandum Opinion having been entered this date, **IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment as to the Claims of the Estate of Michael Molina (Doc. 52) is **GRANTED IN PART and DENIED IN PART**.

**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**